UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA ex rel.
 FIRST AMERICAN ENGINEERED SOLUTIONS, LLC and
 GERALD MORRIS,

        Plaintiffs,

v.         Case No. 08-C-141

OLIN CORPORATION.,

        Defendant.

**DECISION AND ORDER**

Plaintiffs brought suit against Defendant Olin Corporation alleging breach of contract, breach of warranty and unjust enrichment. The complaint also alleged violations of the federal False Claims Act and Small Business Act. Defendant Olin has now moved to dismiss these latter counts and to compel arbitration of the contract claims. For the reasons given herein, the Defendant's motion will be granted.

**I. Background**

According to the amended complaint, First American Engineered Solutions, LLC ("FAES") and Olin entered into a contract (the "Distributor Agreement") making FAES an authorized distributor for ammunition manufactured by Olin's Winchester Ammunition Division.[1] The

---

[1] The contract is attached as Exhibit 1 to the amended complaint and is thus fair game for consideration in a motion to dismiss.

relationship was based on both parties' desire to supply ammunition to the Department of Homeland Security (DHS) under an extended contract with the Federal Law Enforcement Training Center. In a nutshell, Plaintiffs allege that Olin failed to supply ammunition in a timely fashion, in breach of their agreement, which caused DHS to find FAES in default under a $6,408 supply contract it had with DHS. (Am. Compl. ¶ 25.) As a result of Olin's failure to timely supply the required ammunition, FAES lost out on its ability to partake in what it alleges was nearly $89 million in procurement contracts over the next five years.

The complaint further alleges that when Olin ultimately shipped ammunition to DHS, the ammunition was the same product that DHS had previously rejected as nonconforming. Because Olin knew that its goods were nonconforming, sending them to DHS and claiming a right to payment constitute (Plaintiffs allege) a false claim in violation of the False Claims Act.

**II. Analysis**

**1. Arbitration**

Defendant moves to compel arbitration of the claims for breach of contract, breach of warranty and unjust enrichment. The Distributor Agreement – the subject of the first three claims brought in the amended complaints – contains a clear arbitration clause: "Any and all disputes arising hereunder shall be settled by binding arbitration by a single arbitrator in East Alton, Illinois under the rules, then obtaining, of the American Arbitration Association and either party may resort to a court in any state to enforce any award pursuant to any such arbitration." (Dkt. # 16, Ex. A at ¶ 25.) Olin notes that the only source of rights FAES has against it arises out of the contract, and the present dispute is thus a dispute "arising" under that contract.

Plaintiffs' argument against arbitration is elliptical. They assert that given the disparity in size between the Olin Corporation and FAES (a one-man operation), they were "over a barrel" at the time the Distributorship Agreement was entered into. Plaintiffs also assert that there are "too many issues intertwined with FLETC [Federal Law Enforcement Training Center]," but they do not elaborate on why the involvement of the FLETC would preclude arbitration of what are essentially private contractual disputes.

To the extent Plaintiffs are attempting to argue that the arbitration clause is unenforceable due to unconscionability, the argument fails. Most contracts are entered into between parties of vastly different bargaining positions (e.g., homeowners and banks, consumers and stores, attorneys and clients, insurers and insureds), and a bare assertion of disparate corporate size does not render an arbitration clause unenforceable. *Koveleskie v. SBC Capital Markets, Inc.,* 167 F.3d 361, 367 (7th Cir. 1999) ("The plaintiff argues that as an individual employee rather than a business entity, she had no bargaining power. However, 'the disparity in the size of the parties entering into the agreement . . . without some wrongful use of that power,' is not enough to render an arbitration agreement unenforceable.") (citation omitted). Such a weak assertion is certainly not sufficient to overcome the strong federal presumption in favor of arbitration.

> When resolving arbitrability disputes, a court must bear in mind the liberal federal policy in favor of arbitration agreements. "[W]here the contract contains an arbitration clause, there is a presumption of arbitrability in the sense that '[a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage.' "

*International Broth. of Elec. Workers, Local 21 v. Illinois Bell Telephone Co.,* 491 F.3d 685, 687-688 (7th Cir. 2007) (citations omitted).

3

Plaintiffs have not made any argument that the first three claims do not arise out of their contractual relationship with Olin, and accordingly I conclude that the claims must be heard by an arbitrator pursuant to the agreement's terms.[2]

**2. False Claims Act**

Plaintiffs' fourth claim is based on the False Claims Act, 31 U.S.C. § 3729 *et seq.* That statute makes it unlawful for any person to "knowingly present[], or cause[] to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1). Plaintiffs assert that the nonconforming ammunition described above constitutes the false claim:

> these defective and nonconforming goods were knowingly, and with fraudulent intent, delivered by the Defendant to the Department of Homeland Security and FLETC evidenced by the fact that the goods were still packaged and contained within the identical lot numbers and identifying bar codes as when they were returned to the Defendant previously from the government as a result of a previously rejected contract Winchester held directly with the government from another place and time.

(Am. Compl. ¶ 73.)

Olin presents two bases for dismissal of the False Claims Act ("FCA") claim. First, it argues that neither of the Plaintiffs was an "original source" of the information. Under the FCA, if a claim of fraud is based on publicly disclosed information, a court may not hear a *qui tam* FCA case unless the relator is the original source of that information. The FCA sets forth that requirement as follows:

---

[2]Plaintiffs also make a bizarre argument regarding pending legislation that may impact certain arbitration agreements. First, the proposed legislation is not the law governing this case. Second, there is no indication that the law would even apply to arbitration agreements contained within standard business-to-business contracts.

4

> (A) No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.
>
> (B) For purposes of this paragraph, "original source" means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.

31 U.S.C. § 3730(e)(4).

"The structure of the public disclosure bar thus requires courts to answer three questions: Was there a public disclosure? If there was a public disclosure, was the *qui tam* action based on the public disclosure? If the action was based on the public disclosure, was the *qui tam* plaintiff an original source?" *United States ex rel. Wilson v. Graham County Soil & Water Conservation Dist.,* 528 F.3d 292, 299 (4th Cir. 2008). *See also United States v. Bank of Farmington*, 166 F. 3d 853, 859 (7th Cir. 1999).

The first question is whether there was a public disclosure of the information. Olin argues that the genesis of the false claim at issue here occurred when, according to the amended complaint, "Federal Contracting Officer Scott Langston . . . informed the Plaintiff FAES by and through its authorized representative, Paul Roppuld" about the nonconforming ammunition. (Am. Compl. ¶ 74.) Olin argues that because Langston was a public official himself, the underlying fraud had thereby been disclosed to the public before the Plaintiffs had anything to do with it. In *Bank of Farmington,* an official with the Farmers Home Administration ("FmHA") called the bank's president to inquire as to why the official had been subpoenaed. 166 F.3d at 857. During the phone call, the bank president informed the FmHA official about the existence of a personal guaranty on

5

a loan the FmHA had also guaranteed. The failure to disclose the guaranty earlier was a violation of federal regulations and constituted the crux of the false claim in that case, and the FmHA official first learned of the guaranty during the phone call to the bank's president.

The court concluded that the information underlying the false claim (the existence of the undisclosed guaranty) was a public disclosure because the bank president had disclosed it to a public official:

> the information about the Bank's misrepresentations upon which Mathews bases her qui tam action was indeed publicly disclosed because the Bank had disclosed it to a competent public official, here Victor Rhea of the FmHA. Disclosure of information to a competent public official about an alleged false claim against the government we hold to be public disclosure within the meaning of § 3730(e)(4)(A) when the disclosure is made to one who has managerial responsibility for the very claims being made. This construction accords with a standard meaning of "public," which can also be defined as "authorized by, acting for, or representing the community." Disclosure to an official authorized to act for or to represent the community on behalf of government can be understood as public disclosure.

*Id.* at 861 (citation omitted). The same analysis applies here. The information in question – that the shipment of ammunition was nonconforming and had already been rejected by DHS – was not only disclosed to the responsible government official (via the shipment itself), it was disclosed to the Plaintiff *by* the government official himself. "The point of public disclosure of a false claim against the government is to bring it to the attention of the authorities, not merely to educate and enlighten the public at large about the dangers of misappropriation of their tax money." *Id.* When the responsible government official already knows about the information underlying the false claim, that information qualifies as having been publicly disclosed.[3]

---

[3]The statute speaks of disclosures being made public in the following ways: "in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media." 31 U.S.C. § 3730(e)(4)(A). Here, the operative phrase is "administrative . . . investigation." The federal official in charge of

6

The next question is whether this lawsuit is "based upon" that publicly disclosed information. It clearly is. The relevant information was simply the fact that the goods shipped by Olin were nonconforming. In the words of the amended complaint, "these defective and nonconforming goods were knowingly, and with fraudulent intent, delivered by the Defendant to the Department of Homeland Security and FLETC." (Am. Compl. ¶ 73.) "Plaintiff's (sic) have direct knowledge of this fact from Federal Contracting Officer Scott Langston, who informed the Plaintiff FAES by and through its authorized representative, Paul Roppuld." (Am. Compl. ¶ 74.) It is thus apparent that this lawsuit is based on the very information that was publicly disclosed.

The final question is whether Plaintiffs were an original source of the information. As discussed above, Plaintiffs were *informed* of the information by the government itself, and so it is difficult to envision how they could be considered a source at all, much less an original one. Even so, Plaintiffs argue that the source of its lawsuit is really the distributor agreement between FAES and Olin. But for the distributor agreement, they argue, Olin would not have had occasion to resubmit the previously-rejected ammunition to the government that forms the basis of the false claim. This argument is difficult to follow. It seems that Plaintiffs are arguing that their agreement with Olin was partly responsible for Olin's decision to submit the ammunition to the government. Even if true, however, that says nothing about whether the Plaintiffs were the source of the *information* exposing the allegedly false claim. The False Claims Act, naturally, does not seek to reward people instrumental in *bringing about* the fraud – it is a statute designed to reward individuals who *expose* the fraud. Thus, the mere fact that Plaintiffs' distribution agreement may

---

the contract was himself the one who uncovered that the shipment was nonconforming. *Bank of Farmington,* 166 F.3d at 862 (administrative investigations may comprise "informal or casual inquiries so long as they are undertaken by authorized officials with official purposes.")

7

have had some role in effectuating or giving rise to Olin's "decision" to commit the alleged fraud does not mean the Plaintiffs are an original source of uncovering that fraud. They learned of the alleged fraud from the government, not the distributor agreement. The fraud – if that's what it is – is fraud regardless of the contractual relationship between Olin and FAES.

In fact, this is the sort of case that exemplifies the kind of opportunism the False Claims Act is not meant to cover. Originally, *qui tam* plaintiffs were allowed to bring actions based on information already known to the government (for example, information found in an indictment), but Congress sensibly amended the law and forbade private False Claims actions based on information the government already possessed. *See United States ex rel. Stinson v. Prudential Ins. Co.,* 944 F.2d 1149, 1153 (3d Cir. 1991). When Congress later amended the law again to allow individuals to bring lawsuits even when the information had been publicly disclosed (for example, by the plaintiff's own disclosure to a government official), it allowed False Claims actions only in the event the *qui tam* plaintiff was himself the "original source" of that information. Here, according to the amended complaint, Plaintiffs are simply trying to capitalize on information the government already knew (and in fact disclosed *to* them), and they are thus not eligible to collect under the FCA. *Bank of Farmington,* 166 F.3d at 858 (noting the sort of "opportunism" involved in *United States ex rel. Marcus v. Hess,* 317 U.S. 537 (1943), in which "a relator recovered for reporting fraud that had been exposed entirely by others.")

Plaintiffs' second argument against dismissal posits that because this is a *qui tam* action on behalf of the government, the claim cannot be dismissed without the government's approval. Under 31 U.S.C. § 3730(b)(1), "[a] person may bring a civil action for a violation of section 3729 for the person and for the United States Government. The action shall be brought in the name of the

8

Government. The action may be dismissed only if the court and the Attorney General give written consent to the dismissal and their reasons for consenting." There is no indication, however, that this provision is meant to apply to any form of dismissal whatsoever, or else the government's consent would be required for the court to dismiss a case even after the government had lost on the merits. Instead, courts interpret the consent language to apply only to voluntary dismissals:

> We also reject Shaver's argument that the district court was without authority to dismiss the action without the written consent of the Attorney General. Shaver relies on 31 U.S.C. § 3730(b)(1), which states that an FCA action brought by a qui tam relator "may be dismissed only if the court and the Attorney General give written consent to the dismissal and their reasons for consenting." We agree with the reasoning of the Second Circuit in *Minotti v. Lensink*, 895 F.2d 100, 103-04 (2d Cir.1990) (per curiam), and we interpret this provision to mean the Attorney General's consent is required only where the relator seeks a voluntary dismissal, not where, as here, the district court grants a motion by the defendant to dismiss for failure to state a claim.

*United States ex rel. Shaver v. Lucas Western Corp.,* 237 F.3d 932, 934 (8th Cir. 2001).

The reasoning of *Shaver* is perhaps especially compelling when the motion to dismiss is based on the "original source" bar, which is jurisdictional. Surely a court, having concluded it lacks jurisdiction under 31 U.S.C. § 3730(e)(4) is not to hear a case to its conclusion merely because the Attorney General has not consented to dismissal on that basis. Accordingly, I conclude the False Claims Act claim should be dismissed because the information was publicly disclosed and the Plaintiffs were not an original source of that information.

**3. Small Business Act**

Olin has also moved to dismiss Plaintiffs' fifth claim, which is based on the Small Business Act, 15 U.S.C. § 631 *et seq*. According to the amended complaint, Olin's interactions with FAES created an "illusion of compliance" with the Small Business Act, when in fact Olin's actions were

9

in violation of a small business subcontracting program and federal small business regulations. (Am. Compl., ¶¶ 80-82.) Olin moves to dismiss on the ground that there is no private right of action under the Small Business Act. *Crandal v. Ball, Ball and Brosamer, Inc.,* 99 F.3d 907, 909 (9th Cir. 1996). Plaintiffs' response brief has not addressed this argument.[4] Finding no reason to depart from the courts that find no private right of action, I conclude the Plaintiffs' fifth claim should also be dismissed.

**III. Conclusion**

For the reasons given above, the fourth and fifth claims are **DISMISSED**. The parties are compelled to arbitrate first, second and third claims in accordance with the terms of the distributor agreement. This case is **STAYED** pending the outcome of that arbitration and the clerk is directed to administratively close the case.

**SO ORDERED** this   11th   day of September, 2008.

 s/ William C. Griesbach
William C. Griesbach
United States District Judge

---

[4]For some reason Plaintiffs have filed a document captioned "Response," in addition to the brief they have filed. (Dkt. # 27.) This "response" purports to set forth additional facts, some of which Olin has construed as additional argument. None of the facts and argument set forth in the response provides a basis to conclude that the Plaintiffs state a claim under the Small Business Act, however.

10